IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

DAVID HOYAL, as Trustee of CRATER )
LAKE TRUST, )
                                       )
        Plaintiff, )    TC-MD 190297G
                                         )
        v. )
                                         )
DEPARTMENT OF REVENUE, )
State of Oregon, )
                                         )
        Defendant. )    **DECISION**

Crater Lake Trust appeals the disallowance of losses from a real estate development company and from razing an unrelated pear orchard. The tax year at issue is 2014. Plaintiff was represented at trial by David Paul Lennon of Lennon & Klein, P.C. Defendant was represented by Darren Weirnick and James Strong, Senior Assistant Attorneys General. Plaintiff's witnesses were Jeffrey Hoyal, who was trustee of Crater Lake Trust during the relevant years; Lori Hoyal, his wife and special trustee of Crater Lake Trust during the relevant years; Nicole Allaoui, *née* Hoyal, their daughter and an employee of Crater Lake Trust during the relevant years; and Richard William Brewster, CPA. The exhibits in evidence are Plaintiff's Exhibits 1 to 36 and 38, and Defendant's Exhibits A to AA and FF.[1]

## I. STATEMENT OF FACTS

Crater Lake Trust is an irrevocable trust created by Jeffrey and Lori Hoyal in 2005. (Ex 7 at 11.) During the years relevant to this appeal, Jeffrey Hoyal served as trustee and Lori Hoyal served as special trustee for banking and finance. (*Id*. at 21; Exs 8 at 1; AA at 13–17.) The trust

---

[1] Plaintiff's Exhibits 37, 39, 40, and 41 were provisionally admitted as rebuttal exhibits at trial, but later excluded after Plaintiff did not provide the court with copies to review after trial.

document names Jeffrey's mother as the trust's beneficiary during Jeffrey and Lori's lifetimes. (*See* Ex 7 at 11.) Jeffrey and Lori's two children—including Nicole Hoyal—are also beneficiaries, contingent on their surviving their parents. (*See id*. at 11, 15.) Lori Hoyal testified that the trust was a family trust for the purpose of holding assets and passing them on to the beneficiaries. David Hoyal, the trustee named on the Complaint, became trustee later and was uninvolved in the events underlying this litigation. (Ex AA at 15–17.)

For many years up to and including 2014, Jeffrey Hoyal had collaborated extensively in a successful magazine subscription business with another businessman, Dennis Simpson. The business involved marketing magazines through direct mailings using a psychological profiling system Hoyal had developed while attending graduate school. (Ex AA at 18–19.) Although Hoyal and Simpson lived in different states after 2010, they remained in constant communication about the subscription business, with Simpson calling Hoyal "every day or multiple times a day." (Ex FF at 3.)

Jeffrey Hoyal's part of the subscription business was conducted through two entities: Hoyal and Associates, Inc., and Breeze Enterprises, LLC. (Ex AA at 17–22.) The former was an S corporation wholly owned by the Hoyals, with Jeffrey Hoyal serving as president and Lori Hoyal as secretary. (*Id*. at 13; *see* Ex H at 7.) The latter was wholly owned by Crater Lake Trust and served as a holding company for the profiling-related intellectual property Jeffrey Hoyal had developed. (Ex. AA at 17–19.) Virtually all of Crater Lake Trust's 2014 income was received pursuant to a consulting agreement whereby Hoyal and Associates paid Breeze Enterprises over $2.4 million. (*See* Exs E at 9; H at 1.)

In addition to Breeze Enterprises, Crater Lake Trust owned or partly owned the following businesses in 2014: TLN LLC, a real estate investment company for which Plaintiff reported a

$13,074 loss; HP Classics LLC, an automobile and airplane restoration company from which Plaintiff reported $675 income; and Novato Development, LLC, of which Plaintiff's reported share of its 2014 losses was $140,361. (Exs AA at 14; E at 11, 14; G at 8.) Plaintiff also reported a net operating loss of over $1.2 million from Novato Development's losses in 2013. (Exs D at 26; E at 1, 20; F at 1.)

A.     *Novato Development LLC*

Crater Lake Trust held a 50-percent interest in Novato Development LLC, a company formed to develop a subdivision in Novato, California. (Exs N at 2; AA at 35–38.) The other half of Novato Development was owned or held for the benefit of Dennis Simpson.[2] (*See* Exs N at 2; AA at 33–34; I at 58.)

Simpson and Jeffrey Hoyal formed Novato Development LLC in 2007. (Ex AA at 35.) Jeffrey Hoyal arranged for financing with a bank and brought in Bob Decker, a contractor, to serve as the project's "point person" in Novato. (*See id*. at 49.) Lori Hoyal kept the books and provided administrative support. (*Id*. at 14–15.) After the decline of the housing market in 2008 and 2009, Novato Development replaced Bob Decker with Jeffrey Hoyal's daughter, Nicole Hoyal. (*Id*. at 49.)

During the years leading up to and including 2013 and 2014, Nicole Hoyal lived onsite in Novato and exercised multiple roles in Novato Development LLC: "manager, director, foreman, supervisor, inspector." (Ex AA at 46.) Plaintiff submitted thousands of pages of contractor invoices and other Novato Development documents addressed to Nicole Hoyal and her LLC, Eagle Eye Management. (Ex 30.) Defendant does not dispute that Nicole Hoyal materially participated in Novato Development's business. (Def's Post-Trial Memo at 4.)

---

[2] Most of Simpson's share was held by his trust's single-member LLC.

Lori Hoyal kept the books for all the businesses in which Crater Lake Trust held a stake except HP Classics. (Ex AA at 14–15.) She testified that her duties for Novato Development extended to other administrative support and included design work in consultation with Nicole Hoyal about the homes under construction. After consulting records not in evidence, including bank statements, telephone records, emails, and a check register, she prepared a worksheet showing the time she estimates having worked on various tasks throughout 2014.[3] (Ex 38.) She concluded that her "total material participation" in Novato Development was 155.59 hours in 2014. (*Id*. at 3.) Approximately half of that total was attributed to telephone conversations with Nicole Hoyal. (*Id*.) She also reviewed Jeffrey Hoyal's telephone records and determined that he had spent about 200 hours on work-related calls, including 147 hours with Dennis Simpson and 46 hours with Nicole Hoyal. (*See* Ex 31.) The remaining hours included calls between Jeffrey Hoyal and the farm manager at Hoyal Farms, Inc—another S corporation owned by Jeffrey and Lori Hoyal.

Jeffrey Hoyal testified that he retained ultimate authority as Novato Development's manager, having been so designated in 2012 when the LLC switched from being member-managed to manager-managed. (Ex N.) He directed Nicole Hoyal to assume her various responsibilities, such as becoming a water inspector to meet city testing requirements. (Ex AA at 47–48.) He expected her to keep him apprised of the project's progress and of problems that arose. (*Id*. at 48.) Jeffrey Hoyal estimated that he worked "[p]robably 500 hours" on Novato Development in 2014. (*Id*. at 72.) He based that estimate on his telephone records and on the "mountains of documents" produced by Novato Development. (*Id*.) He also visited Nicole

---

[3] The details of the calculation recorded on the worksheet are unclear. The total time reported for each month's activities varies from the sum of the individual times for that month's recorded activities in February, May, June, July, September, and December. (*See* Ex 38.)

Hoyal quarterly for a day or two, during which time he attended home owners association meetings associated with Novato Development.  Jeffrey Hoyal estimated that he worked 500 hours at each of four other businesses: Hoyal and Associates, Breeze Enterprises, HP Classics, and Hoyal Farms.  (*Id*. at 70–71.)

In 2017, Dennis Simpson brought a lawsuit against Jeffrey and Lori Hoyal in circuit court.  (Ex I at 1.)  Jeffrey and Lori Hoyal's responsive pleading included the following allegation:

> "Hoyal was the nominal manager of Novato, but Simpson, directly and through one or more agents, including Noel Parducci, was fully aware of and controlled the financial reporting, development decisions, and matters relating to the sale of subdivision lots by Novato."

(*Id*. at 33.)  Jeffrey Hoyal affirmed the truth of that allegation and further testified that "[e]very * * * financial transaction that happened in Novato had to be run through [Noel Parducci] and run through Dennis Simpson."  (Ex AA at 75–76.)  When Jeffrey Hoyal was asked in a follow-up question whether development decisions were run through Jeffrey Hoyal, his response was: "They had to be run through me through him."  (*Id*. at 76–77.)

B.    *Pear Trees*

In July 2013, Plaintiff purchased an 80,000-tree pear orchard from Associated Fruit Company for $1,250,000.  (Ex 14 at 1.)  Associated Fruit retained ownership of the pear crop then growing and a leasehold through the 2014 harvest.  (Ex 15 at 1.)  No rent was required for the lease, but the lease would "terminate in its entirety" by November 1, 2014.  (*Id*. at 1–2.)  Plaintiff and Associated Fruit attempted to negotiate an allocation of the sale price between the land and the pear trees.  At that time, Plaintiff sought to allocate $650,000 to the pear trees, while Associated Fruit sought to allocate all value to the land; in the end, no allocation was included in the purchase and sale agreement.  (Exs 18 at 1; 19 at 10.)  Plaintiff ultimately allocated a basis of

$800,000 to the pear trees on its 2014 depreciation schedule. (Ex E at 21.) Jeffrey Hoyal testified that he derived an allocation of $10 per tree from the nursery price of a young pear tree and from the difference in average value between pear-bearing and irrigated acreage in Oregon divided by the number of trees per acre. (Exs 25 at 47; 26 at 9.)

Associated Fruit terminated the lease after the 2013 harvest—a year early—whereupon Plaintiff leased the land to Hoyal Farms. (Exs 21 at 1; 13 at 1.) Jeffrey Hoyal testified that he decided not to continue growing pears without a tenant, citing the state of the market, the expense of pest control, and his own experience in growing hay rather than pears. He arranged to have the trees removed by a power company for use as biofuel in the spring or summer of 2014.[4] He then prepared the land for growing hay.

The 2013 purchase was not the first time Jeffrey Hoyal had considered the value of a pear orchard. In 2007, he had purchased a former pear orchard contiguous to the one he would later purchase in 2013. (Ex AA at 95–96.) He replanted that land—first with olive trees, later with hay. In a 2008 newspaper article he was quoted explaining that "the pear industry is going bye-bye" and he "knew we weren't going to stay in pears; there's no money there[.]" (Ex X at 1.)

Plaintiff reported a loss of $765,800 in 2014 based on the removal of 80,000 pear trees, reflecting an $800,000 basis less $34,200 in depreciation. (Ex E at 16, 21.)

/ / /

/ / /

/ / /

/ / /

---

[4]  Plaintiff's 2014 Form 4797 reports a "date sold" for the pear trees of April 30, 2014. (Ex E at 16.) That document's dating is uncertain; it also indicates a "date acquired" of January 1, 2012, as opposed to the actual acquisition date in mid-2013.

C.    *Adjustment and Appeal*

Defendant disallowed all of Plaintiff's claimed 2014 losses and carryover losses from 2013 for Novato Development on the ground that Novato Development was a passive activity for Plaintiff. Defendant also disallowed Plaintiff's claimed 2014 losses for the pear tree removal.[5]

Plaintiff asks this court to reverse the above adjustments and allow its claimed losses for Novato Development and the pear trees. Defendant asks the court to uphold its adjustments.

## II. ANALYSIS

The issues are whether Novato Development was a passive activity for which losses are disallowed by IRC section 469(a)(1) and whether Plaintiff is entitled to a deduction for the razed pear trees.[6]

Subject to modifications not pertinent here, taxable income under Oregon law is determined according to the relevant provisions of the Internal Revenue Code (IRC) and by the federal Treasury regulations referred to therein. ORS 316.022(6); 316.032(3); 316.048. As the party seeking affirmative relief, Plaintiff bears the burden of proof on all factual questions *See* ORS 305.427.

A.    *Novato Development*

1.    *Trusts' material participation under IRC section 469*

Although business losses are generally deductible under IRC section 165(a), special restrictions apply to losses generated from "passive activity." IRC § 469. A taxpayer who is involved in a business or trade, but does not "materially participate" in it, engages in "passive activity." IRC § 469(c). A typical example of such passive activity is investment in real estate

---

[5] Defendant also disallowed a much smaller loss from TLN LLC, which Plaintiff conceded before trial.

[6] Unless otherwise noted, the court's references to the Internal Revenue Code (IRC) are to provisions in effect December 31, 2014.

by a professional engaged in another field. Net losses from passive activity are not allowed for the year in which the losses are incurred, but may be carried forward and deducted from passive activity gains in the next taxable year. IRC § 469(a), (b); ORS 314.300. Passive activity losses may not be used to offset gains from nonpassive activities unless an exception applies. *See* IRC § 469.

"Material participation" is cursorily defined in section 469(h) of the Code as a taxpayer's involvement in an activity's operations on a basis that is "regular," "continuous," and "substantial." IRC § 469(h). The taxpayer in question must be an individual, estate, trust, closely held C corporation, or personal service corporation. *See* IRC § 469(a)(2). For individuals and corporations, federal regulations provide additional guidance as to what constitutes material participation. Treas Reg §§ 1.469–5T; 1.469–1T(g)(3). However, no regulation specifically addresses material participation by trusts and estates. *Cf.* Treas Reg § 1.469–5T(g) (reserving space for future regulation on "[m]aterial participation of trusts and estates").

Lacking a regulation on material participation by trusts, the parties here disagree about whose actions affect whether a trust materially participates in a business activity. Defendant argues that only the actions of the trust's fiduciaries are relevant; Plaintiff argues that the actions of an agent and beneficiary working on behalf of the trust are also relevant. The parties' disagreement aligns with a disagreement between the IRS and the only federal case decided on that issue.

That federal case is *Mattie K. Carter Trust v. United States*, 256 F Supp 2d 536 (ND Tex 2003), in which the district court considered whether a testamentary trust materially participated in the operation of a ranch. The IRS had argued that "the material participation of a trust in a

business should be made by reference only to the trustee's activities." *Id.* at 540. The court disagreed based on the text of IRC section 469(a)(2), which designates the "trust"—rather than the trustee—as the taxpayer subject to the passive activity limit. *Id.* at 541. Beginning from the major premise that "section 469 says that a trust is a taxpayer," the district court reasoned as follows:

> "It is undisputed that Carter Trust, not [the trustee], is the taxpayer. Common sense dictates that the participation of Carter Trust in the ranch operations should be scrutinized by reference to the trust itself, which necessarily entails an assessment of the activities of those who labor on the ranch, or otherwise in furtherance of the ranch business, on behalf of Carter Trust. *Cf. Fojtik v. First Nat'l Bank*, 752 SW 2d 669, 673 (Tex App—Corpus Christi 1988) (explaining that "the acts of a corporation's agents are deemed to be acts of the corporation itself"), *writ denied per curiam*, 775 SW 2d 632 (Tex 1989)."

*Id*. at 540–41. In the above words, the district court concluded that employees' actions could qualify a trust as materially participating in a business, apparently by an analogy between trust employees and the agents of a corporation.

The IRS disagrees with the rule of *Carter Trust* that any trust employee's actions may count toward material participation. *See Frank Aragona Tr. v. Comm'r*, 142 TC 165, 178 n 14 (2014) (noting disagreement without deciding issue). Instead, the IRS applies the rule that "[a] trust materially participates in an activity for purposes of [section] 469 if the *fiduciaries* of the trust participate in the operations of the activity on a basis which is regular, continuous, and substantial." IRS Tech Adv Mem 200733023 (Aug 17, 2007) (emphasis added.) A trustee is a prototypical example of a fiduciary under IRC section 7701(a)(6), although mere titles do not control and the IRS will not recognize as a fiduciary a trustee lacking "any indicia of discretionary power." *Id*.

In the present case, Plaintiff, relying on *Carter Trust*, alleges Crater Lake Trust materially participated in the operations of Novato Development through the activity of Nicole Hoyal "as a

beneficiary and agent of Crater Lake Trust" and her parents as trustee and special trustee. (Ptf's Post-Trial Brief at 3.) Defendant urges the rule followed by the IRS, arguing that Nicole Hoyal's involvement in Novato Development cannot be attributed to Crater Lake Trust and that Jeffrey and Lori Hoyal did not have regular, continuous, and substantial involvement in Novato Development. *See* IRC § 469(h).

2. Carter Trust *and Nicole Hoyal's participation*

Trusts are generally treated as juridical persons in the IRC, just as corporations are. *See* IRC § 7701(1) (term *person* includes "an individual, a trust, estate, partnership, association, company or corporation"). That conception of the trust as an entity distinct from the duties of the trustee and rights of the beneficiaries is an example of a development noted in section 2 of the Restatement (Third) of Trusts (2003):

> "Increasingly, modern common-law and statutory concepts and terminology tacitly recognize the trust as a legal 'entity,' consisting of the trust estate and the associated fiduciary relation between the trustee and the beneficiaries. This is increasingly and appropriately reflected both in language (referring, for example, to the duties or liability of a trustee to "the trust") and in doctrine, especially in distinguishing between the trustee personally or as an individual and the trustee in a fiduciary or representative capacity."

*See also*, *e.g.*, *Hannah v. Washington Cty. Assessor*, TC-MD 150449N, 2016 WL 6988865 at *3 (Or Tax M Div Nov 29, 2016) (holding change in trustees did not transfer property partly because "the trust, through its trustees, continued to hold legal title"). Absent any more specific indication to the contrary, the term *trust* as used in IRC section 469(a)(2)(A) may be taken to refer to a legal entity akin to a corporation. In that context, it is reasonable to look for an analogy between trusts and corporations.

Both closely held C corporations and personal service corporations are subject to the passive activity limits of IRC section 469. IRC § 469(a)(2). Such corporations materially

participate in an activity where shareholders holding "more than 50 percent (by value)" of the corporation's stock materially participate. IRC § 469(h)(4)(A). Material participation thus generally depends on the actions of the corporation's owners, rather than on its employees or agents.[7]

The district court in *Carter Trust* correctly perceived an analogy between trusts and corporations. That court resolved the case before it by applying to trusts the general principle that a corporation acts through its agents. *Carter Trust*, 256 F Supp 2d at 540–41. However, whether a trust or a corporation *acts* through its employees is of less importance here than whether that trust or corporation *materially participates* through its employees. In dealing with the statute that coined the term "passive activity," it should not be assumed that mere action is equivalent to "material participation." In fact, as shown above, IRC section 469(h)(4)(A) provides that it is the owners of corporations rather than the employees whose actions can bring about material participation. The rule of agency extended by the *Carter Trust* court to trusts does not even apply to corporations for the purpose of determining material participation. *See* IRC § 469(h)(4)(A). Given that immediate context within section 469, the rule of *Carter Trust* is unsupported and unpersuasive.

In this case, Plaintiff alludes to Nicole Hoyal's status as "beneficiary and agent" in arguing that her participation should be considered as bearing on Crater Lake Trust's participation. Plaintiff's sole authority for interpreting IRC section 469 as allowing cognizance of Nicole Hoyal's activities is *Carter Trust*. *Carter Trust* is not persuasive regarding her activities as agent (if she was an agent of Crater Lake Trust, which Defendant disputes) because

---

[7] Closely held C corporations are also deemed materially participating if they have three full-time nonowner employees, a full-time manager, and business expenses of at least 15 percent of their gross income. IRC §§ 469(h)(4)(B); 465(c)(7)(C).

its analogy with corporations neglects the ownership requirement of IRC section 469(h)(4)(A). *Carter Trust* contains no holding and makes no argument with respect to activities of beneficiaries as such.

What persons associated with a trust would be analogous to the owners of a corporation? Ownership of trust property differs significantly from ownership of corporate stock. Trust property's ownership is split: it is divided between the trustee's legal title and each beneficiary's equitable interest. *Brandrup v. ReconTrust Co., N.A.*, 353 Or 668, 703, 303 P3d 301 (2013). Might a majority of a trust's ownership include beneficiaries' equitable interests? The requirements for corporate ownership under the passive activity limits suggest not. IRC section 469(h)(4)(A) applies to "shareholders holding stock." That formula implies that legal title is required—it is the one who holds the stock that must participate, not necessarily the one for whose benefit the stock is held. The most plausible analogy to trusts from the treatment of corporations by IRC section 469 requires material participation by trustees without regard to the participation of beneficiaries.[8]

As applied here, the material participation of Nicole Hoyal in the work of Novato Development cannot be attributed to Crater Lake Trust. Nicole Hoyal was a contingent beneficiary, but not a trustee or a fiduciary of the trust. It is not clear that Nicole Hoyal was an employee of the trust rather than of Novato Development, although that fact makes little difference under this analysis. As a nonowner, Nicole Hoyal's work for Novato Development does not qualify as Crater Lake Trust's material participation.

/ / /

---

[8] This discussion assumes the trust is not a grantor trust. *Cf.* IRC §§ 671ff. The parties agree that Crater Lake Trust is not a grantor trust.

3.      *Participation of Jeffrey and Lori Hoyal*

There is no controversy that material participation by Jeffrey Hoyal, as trustee, would qualify as material participation by Crater Lake Trust. As legal owner of "more than 50 percent (by value)" of the trust's assets, Jeffrey Hoyal stood in the place of the majority shareholders of a corporation. *Cf.* IRC § 469(h). The relevance of Lori Hoyal's status as special trustee is less clear, but as Jeffrey Hoyal's wife her activity would be pooled with his in determining his individual material participation in a business activity. *See* Treas Reg § 1.469–5T(f)(3).

No regulation specifies the activities that would make a trustee materially participate in an activity, but regulations do specify such requirements in the case of an "individual." Treas Reg § 1.469–5T. In the absence of some contrary indication, the word "individual" means "natural person" or "human being." *See Mohamad v. Palestinian Auth.*, 566 US 449, 455, 132 S Ct 1702, 182 L Ed 2d 720 (2012). In this case, the trustee and special trustee were both human beings, and it makes sense to analyze their actions according to the regulation that applies to individuals.

An individual person's participation in an activity will be "material participation" if it meets any one of seven criteria given in Treasury Regulation section 1.469–5T(a), set forth in the margin.[9] *See* IRC § 469(l)(1) (requiring that Secretary prescribe regulations "which specify what

---

[9] The seven criteria are as follows:

"(1) The individual participates in the activity for more than 500 hours during such year;"

"(2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

"(3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

"(4) The activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's aggregate participation in all significant participation activities during such

constitutes an activity, material participation, or active participation for purposes of this section"). Work done in the capacity of an investor—such as monitoring the finances and operations of a business—is not treated as participation unless the investor is "directly involved in the day-to-day management or operations of the activity." Treas Reg § 1.469–5T(f)(2)(ii)(A).

In the present case, it is undisputed that Nicole Hoyal managed Novato Development's day-to-day operations, working full time and putting far more hours into the business than her parents. Because another person's participation outstripped theirs, Jeffrey and Lori Hoyal do not meet criteria (2) or (3). It is likewise undisputed that Novato Development's business was not a personal service activity, so the Hoyals do not meet criterion (6). In addition, Plaintiff's evidence focused on 2013 and 2014; because Crater Lake Trust did not present evidence to establish five years of material participation, it has not shown that the Hoyals meet criterion (5). There remain criteria (1), (4), and (7).

Criterion (1) would require that Plaintiff show that Jeffrey and Lori Hoyal participated in Novato Development for more than 500 hours in 2014. Jeffrey Hoyal estimated his 2014 participation in Novato Development was "probably 500 hours" based on his telephone records and the quantity of paperwork produced. However, while the volume (and weight) of paperwork introduced as Exhibit 30 is impressive, all 2,955 pages were produced from Nicole Hoyal's file.

---

year exceeds 500 hours;

"(5) The individual materially participated in the activity (determined without regard to this paragraph (a)(5)) for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

"(6) The activity is a personal service activity (within the meaning of paragraph (d) of this section), and the individual materially participated in the activity for any three taxable years (whether or not consecutive) preceding the taxable year; or

"(7) Based on all of the facts and circumstances (taking into account the rules in paragraph (b) of this section), the individual participates in the activity on a regular, continuous, and substantial basis during such year."

Any involvement of Jeffrey Hoyal in generating it beyond what is reflected in his telephone records is not apparent.

The telephone records show about 46 hours of conversation between Jeffrey and Nicole Hoyal in 2014, according to Defendant's undisputed analysis. (Ex 31; Def's Post-Trial Memo at 36–41.) Those conversations occurred throughout the year—on 112 weekdays, 10 weekend days, and Christmas. (*See id.*) According to Lori Hoyal's undisputed testimony, those telephone records also show about 147 hours of telephone conversation between Jeffrey Hoyal and Dennis Simpson. If every minute of those telephone conversations concerned Novato Development, Plaintiff would have shown 193 hours of participation by Jeffrey Hoyal. Lori Hoyal estimated her own 2014 participation in Novato Development at about 156 hours. (*See* Ex 38 at 3.) If that estimate were accepted, it would bring the tally to 349 hours of participation over the telephone.

According to testimony, Jeffrey Hoyal also visited Novato Development quarterly for a day or two and stayed with his daughter. There is no evidence of how much of that time was spent on business, but even if 20 hours per trip were allowed, Plaintiff would still not have shown that the Hoyals had spent 500 hours on Novato Development in 2014. The Hoyals have not shown that they meet criterion (1).

Criterion (4) relies on the definition of a "significant participation activity." Treas Reg § 1.469–5T(a)(4). A significant participation activity is one in which a taxpayer participates for at least 100 hours in a year, but not in such a way as to qualify as material participation under another criterion; *i.e.*, not more than 500 hours in a year. *See* Treas Reg 1.469–5T(c); *Brown v. Commissioner*, 117 TCM (CCH) 1339 (2019). Taxpayers with multiple significant participation activites will meet criterion (4) if their aggregate participation in all such activities is more than 500 hours. Treas Reg 1.469–5T(a)(4).

Jeffrey Hoyal was involved in other businesses, including: Breeze Enterprises, LLC, a holding company for intellectual property used in the magazine subscription business; HP Classics, LLC, which restored old automobiles and airplanes; and Hoyal Farms, Inc. Jeffrey Hoyal estimated that he spent 500 hours at each of those businesses—the upper limit of a significant participation activity. However, the available evidence calls that estimate into question. The magazine subscription business was a primary source of income for Crater Lake Trust, and in 2014 the trust reported over $2.4 million in income for "management services" provided to Breeze Enterprises. (Ex E at 9.) The trust reported just $675 in income from HP Classics LLC. (*Id*. at 14.) Absent further evidence or explanation, it is unlikely that Jeffrey Hoyal spent the same amount of time at each business. In addition, Jeffrey Hoyal estimated he spent another 500 hours working in the magazine subscription business for his S corporation, Hoyal and Associates, Inc., but it is not clear how he allocated his time between that entity and Breeze Enterprises. Because the evidence does not establish the amount of time Jeffrey Hoyal worked for his other businesses, Plaintiff has not shown that Jeffrey Hoyal met criterion (4).

Criterion (7) allows finding regular, continuous, and substantial participation "[b]ased on all of the facts and circumstances," subject to certain rules. Treas Reg § 1.469–5T(a)(7). At a minimum, the taxpayer must participate for 100 hours, and "services performed in the management of an activity" are not counted if anyone other than the taxpayer receives compensation for managing the activity or spends more time managing it. *See* Treas Reg § 1.469–5T(b)(2).

Because Nicole Hoyal was compensated for managing Novato Development, and because she spent more hours at that work than her parents, any management activities of Jeffrey Hoyal cannot count toward satisfying criterion (7) for Plaintiff. *See* Treas Reg § 1.469–5T(b)(2).

In addition, as noted above, time spent participating as an investor is excluded from material participation. *See* Treas Reg § 1.469–5T(f)(2)(ii).

Jeffrey Hoyal's role in Novato Development was as an investor and a manager. Not only was he Novato Development's manager "on paper," but the evidence tends to show that he did in fact oversee Nicole Hoyal's management activities. He directed her to obtain certain licensures, approved invoices for her reimbursement, and solved problems she brought to him in their telephone conversations. While there is some question as to the degree of Simpson's involvement in managing the project, it is clear that Jeffrey Hoyal was in a position to manage the business and was not simply an employee.

Lori Hoyal estimated that she worked 156 hours for Novato Development in 2014, about half of which consisted of telephone calls with her daughter. She estimated the remainder of her time at a few minutes several days per month. For example, she estimates she worked 20 minutes for Novato Development on each of 14 trips to the post office and 18 trips to the bank. Those granular estimates, made more than half a decade after the events they describe, carry little weight. Moreover, it is not clear whether Lori Hoyal separated out the time she spent working on the other businesses for which she kept books and performed administrative tasks.

On the evidence available, Plaintiff has not shown any specific amount of time that Jeffrey Hoyal participated in a nonmanagerial capacity, and has not shown that Lori Hoyal's involvement was regular, continuous, and substantial. Criterion (7) is not satisfied.

Special rules for material participation apply to taxpayers in "real property business." IRC § 469(c)(7). To show that Jeffrey Hoyal qualified for such treatment, Plaintiff would need to show that he spent more than half his working time and more than 750 hours in real property trades or businesses. IRC § 469(c)(7)(B). Considering the state of the evidence as discussed

above, including the evident extent of Jeffrey Hoyal's magazine-subscription activity, neither of those factors has been shown.  Therefore, the "real property business" rules do not apply here.

Plaintiff has not shown that the combined activity of Jeffrey and Lori Hoyal amounted to material participation in Novato Development.

B.      *Pear Tree Disposition*

Taxpayers disposing of property at a loss generally may deduct the excess of their adjusted basis over any amount realized from the disposition.  IRC §§ 165(a); 1001(a); Treas Reg § 1.165–1(c)(1).  A property's adjusted basis is its cost, modified by depreciation, amortization, depletion, items "properly chargeable to capital account," and other items specified in the Code.  IRC §§ 1011(a); 1012(a); 1016(a); Boris Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 42.4 (2021) (listing other adjustments to basis).  Where depreciable and nondepreciable assets are purchased together—for example, land with buildings on it—the purchase price must be allocated between the different assets for purposes of determining basis.  IRC § 1060(a); Treas Reg § 1.167(a)–5.

Taxpayers purchasing depreciable assets with intent to destroy them may be required to allocate the entire purchase price to the basis of nondepreciable assets purchased in the same transaction.  The regulations specially provide for the case of a taxpayer purchasing improved land with the intent to demolish the buildings on it: in that case, a deduction for the loss of the buildings is generally disallowed and "[t]he entire basis of the property so purchased shall * * * be allocated to the land only."  Treas Reg § 1.165–3(a).  There is a limited exception where the buildings are intended to be used for a period of time before demolition; in that case, they may be assigned a basis not exceeding "the present value of the right to receive rentals from the buildings over the period of their intended use."  *See id*.; *Argo v. Commissioner*, 45 TCM (CCH)

385 (1982). While Treasury Regulation section 1.165–3(a) applies by its terms only to building demolition, its application "to items other than buildings has been sanctioned by the cases for a very long time[.]" *Argo*, 45 TCM (CCH) 385 (applying regulation to irrigation system purchased with intent to demolish).

The demolished-building regulation has been specifically applied to orchards in two cases: *Eaton v. Commissioner*, 95 F2d 628 (9th Cir 1938), and *Wilson v. Commissioner*, 41 TCM (CCH) 381 (1980). In *Eaton*, the Ninth Circuit held that where the taxpayer had purchased apple and pear trees intending to destroy them, "the trees destroyed had no cash basis." 95 F2d at 628. In *Wilson*, the taxpayer had razed a prune orchard shortly after purchase and replanted with row crops. In determining the taxpayer's intent, the U.S. Tax Court applied the factors enumerated in section 1.165–3(c) of the Treasury Regulations for determining intent to demolish buildings.[10]

---

[10] Section 1.165–3(c) of the Treasury Regulations states:

"(c) Evidence of intention. (1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom.

"(2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings.

"(3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property."

*Wilson*, 41 TCM (CCH) 381 (finding it "hard to imagine why a prudent businessman would purchase the [subject] property to raise prunes in light of the decline in the prune market and the insect infestation problem that existed at that time").

In the present case, the circumstances surrounding Crater Lake Trust's purchase of the pear orchard strongly suggest its trustee did not intend to grow pears beyond the period of the leaseback. Jeffrey Hoyal's opinion of the pear market in 2008 is on record in a newspaper article about a previous orchard purchase: "We knew we weren't going to stay in pears; there's no money there[.]" (Ex X at 1.) That business judgment does not appear to have changed before the purchase now in question; Hoyal testified that the pear market had declined and that pest control was a major concern. *See* Treas Reg § 1.165–3(c)(2)(v). He further testified that he would not grow pears without a tenant to farm them because he did not have experience in that type of farming. *See* Treas Reg § 1.165–3(c)(2)(iv). Nevertheless, the lease with Associated Fruit expressly limited the duration of that tenancy, allowing Associated Fruit to harvest in 2013 and 2014, but entirely terminating that right after the 2014 harvest. (Ex U at 1–2.) In the event, Associated Fruit terminated the lease early and Plaintiff destroyed the pear trees before the next harvest. *See* Treas Reg § 1.165–3(c)(2)(i).

None of the factors tending to show an intent to preserve the trees is applicable: there is no evidence that Plaintiff invested in the trees or used them; no evidence of changes in the market or in the trees' utility; no evidence that the trees were subsequently damaged or found defective. *See* Treas Reg § 1.165–3(c)(3).

The court therefore finds that at the time of purchase Plaintiff's trustee intended to destroy the pear trees after the expiration of the lease with Associated Fruit. Because that lease

/ / /

did not provide for any rent, Plaintiff's basis for the purchase should be allocated entirely to the land. *See* Treas Reg § 1.165–3(a); *Eaton*, 95 F2d at 628.

### III.  CONCLUSION

On the evidence presented, the court finds that Novato Development was a passive activity for Plaintiff and that Plaintiff had no basis in the pear trees that were destroyed. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this _____ day of December 2021.

_____
POUL F. LUNDGREN
MAGISTRATE

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.***

***Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at <u>https://www.courts.oregon.gov/courts/tax</u>***

***This document was signed by Magistrate Poul F. Lungren and entered on December 20, 2021.***